Timothy SLAUGHTER and Karla
Slaughter, Plaintiffs

v.

LIFE CONNECTION OF
OHIO, Defendant.

No. 1:95CV00331.

United States District Court,
M.D. North Carolina,
Durham Division.

Dec. 6, 1995.

Pulley, Watson, Sind & Lisher, P.A. by Richard N. Watson and Tracy K. Lischer; Durham, NC, for plaintiffs.

Womble Carlyle Sandridge & Rice by Robert Harrison Sasser, III and Susan D. Crooks; Raleigh, NC, for defendant.

## MEMORANDUM OPINION

ERWIN, Senior District Judge.

This matter is before the Court upon Life Connection of Ohio's (LCO's) Motion to Dismiss the Complaint for lack of personal jurisdiction. The Court, having reviewed the pleadings, motion, memoranda of law and oral arguments of the parties, denies the Defendant's Motion to Dismiss.

### Statement of Facts

LCO is a federally certified organ procurement organization (OPO) incorporated under the laws of Ohio. It is engaged in providing organs and tissue from donors in the northwestern Ohio region for interstate research or transplantation. LCO participates in the National Organ Procurement and Transplantation Network (OPTN) and is an institutional member of the United Network for Organ Sharing (UNOS).

UNOS is a not-for-profit corporation in Richmond, Virginia. The allocation of cadaveric kidneys is governed by UNOS criteria and guidelines. Normally, an OPO secures organs for transplantation within its particular service area, but UNOS mandates the sharing of six-antigen match cadaveric kidneys with patients on the national UNOS Patient Waiting List. If such a match exists, UNOS requires that the kidney be made available first to the patient meeting the match. After LCO procures a kidney from a donor, it coordinates a nationwide search using the UNOS database to identify the best match for the organ.

Plaintiff Timothy Slaughter (Slaughter) registered with UNOS so that OPOs, such as the defendant here, seeking a six-antigen match for the kidneys they had to place would have the option of offering a kidney to him. Plaintiff Karla Slaughter is the wife of Slaughter, and both are residents of Roxboro, North Carolina.

On April 8, 1993, LCO was advised by a local Ohio hospital of the potential availability of organs from a patient who had suffered a massive subarachnoid hemorrhage. With the donor's condition deteriorating, the donor was taken to the operating room after midnight on April 9, 1993 for removal of the kidneys by LCO's medical director. The laboratory performing serological testing entered the donor's tissue typing results into the computer which accesses UNOS and received from UNOS a list of potential recipients with six-antigen matches for the kidney. There is no indication that LCO was aware of the geographic location of the potential transplant recipients prior to its harvesting of the kidneys but subsequently learned from the Organ Center that the kidneys were to be sent to Durham, North Carolina and to Philadelphia, Pennsylvania. LCO was later informed that Philadelphia could not locate its potential recipient.

The kidney transplant recipient in Durham, North Carolina was Plaintiff Slaughter. The Complaint filed on May 11, 1995 alleges that he contracted cancer from the kidney supplied by LCO and that LCO was negligent in its procurement of the kidney from the donor. LCO's initial action was the filing of its Answer which asserted, inter alia, that the Court lacked personal jurisdiction over it. LCO moved for dismissal pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure contending that it was only remotely connected with North Carolina by providing UNOS with donor information and that it was a matter of chance that a six-antigen match recipient was located in North Car-

olina. Now before this Court is LCO's Motion to Dismiss.

### Analysis

The resolution of the question of in personam jurisdiction involves a two-fold determination:

Initially, examination focuses upon the terms of the statute itself purporting to confer personal jurisdiction. This determination hinges upon application of the pertinent state law. Attention then turns to federal law for an analysis of whether the exercise of jurisdiction in a particular case violates due process of law. *Hardy v. Pioneer Parachute Co., Inc.,* 531 F.2d 193, 195 (4th Cir.1976); *Gemini Enterprises, Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 563 (M.D.N.C.1979).

*Southern Case, Inc. v. Mgmt. Recruiters Int'l,* 544 F.Supp. 403, 405 (E.D.N.C.1982). Thus, the Court begins its inquiry with the applicable state law.

**I.** *State Grounds Governing Personal Jurisdiction*

■ North Carolina Gen.Stat. § 1–75.4 is commonly referred to as the long-arm statute. There is a clear mandate that the North Carolina long-arm statute be given a liberal construction. *Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062 (4th Cir.1982). It allows for the exercise of personal jurisdiction in potentially relevant part as follows:

(1)(d) In any action ... [if defendant] is a domestic corporation ... or is engaged in substantial activity within this State....

....

(4) In any action claiming injury to person ... within this State arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury either:

(a) Solicitation or services activities were carried on within this State by or on behalf of the defendant; or

(b) Products, materials or thing processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade.

(5) In any action which:

(a) Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to perform services within this State ... or

(b) Arises out of services actually performed for the plaintiff by the defendant within this State ... or

....

(e) Relates to goods, documents of title, or other things of value actually received by the plaintiff in this State from the defendant.

N.C.Gen.Stat. § 1–75.4 (1983).

Under both the North Carolina and Ohio Uniform Anatomical Gift Acts, the procurement of organs is expressly considered for all purposes as the rendition of a service by every participating person or institution. *See* N.C.Gen.Stat. § 130A–410 (1992); Ohio Rev.Code Ann. § 2108.11 (1991).

LCO explains in its organ donor manual that it follows UNOS's policies for the distribution and allocation of organs for transplantation. (LCO Organ Donor Manual at B–1.) Under UNOS's guidelines, the OPO assumes responsibility for organ allocation. (UNOS Policy Manual at § 3.1.6.) The OPO is responsible for transportation of kidneys to the destination designated by the recipient member. (UNOS Policy Manual at § 5.7.)

In the present case, LCO undertook through its membership in UNOS to procure the kidney for Plaintiff Slaughter's transplant, and it packaged and shipped the kidney to North Carolina. The kidney was not provided to him in Ohio—it was provided to him in North Carolina, and LCO's service was not complete until the kidney was delivered to this state.

Under the UNOS policies in effect at the time of Plaintiff Slaughter's donation, the Host OPO, in this case, LCO, is responsible not only for transportation of kidney(s) to the primary destination designated by the recipient member; it is also responsible for the

cost of shipping the kidney(s) to that location. (Dan Stockdreher Dep. at 2.)

After packaging and shipping the kidney transplanted into Slaughter, LCO sent an invoice for $10,800 to Carolina Organ Procurement Association (COPA) in Greenville, North Carolina.[1] The invoice stated "For Services Rendered in one Cadaveric Kidney," and further declared "Service Rendered To: Recipient T. Slaughter." COPA forwarded the invoice to Duke University Medical Center and Slaughter was then billed by Duke. The LCO invoice was ultimately paid on behalf of Slaughter by the Southeastern Organ Procurement Foundation, a Virginia not-for-profit entity that is used for making payment for organs sent to the southeastern region of the United States.

LCO's direct billing of a North Carolina entity further evidences its commitment to provide the kidney for transplantation within North Carolina. Accordingly, the exercise of jurisdiction pursuant to N.C.Gen.Stat. § 1–75.4(5)(a) is proper. Since the Court upholds personal jurisdiction under § (5)(a), it need not address the other potentially relevant subsections.

■ The North Carolina long-arm statute is intended to extend jurisdiction to the limits permissible under federal due process. *See Waller v. Butkovich,* 584 F.Supp. 909 (M.D.N.C.1984). It cannot extend beyond those limits. The next inquiry, therefore, must address jurisdiction over LCO in the context of due process.

## II. *Personal Jurisdiction Pursuant to Federal Due Process*

The constitutional constraints on the exercise of jurisdiction as found in the due process clauses are familiar and are summarized here as a basis for analysis. The starting point for such an inquiry is *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That case established the use of a flexible standard in determining the requirements of personal jurisdiction by a state over foreign

defendants. The test to be applied is whether the non-resident defendant has "certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158.

■ North Carolina courts use certain primary and secondary factors in determining minimum contacts questions. These include three primary factors: (1) quantity of contacts, (2) nature and quality of contacts, and (3) the source and connection of the cause of action with these contacts. Two secondary factors are interests of the forum state and convenience to the parties. No single factor controls, but they all must be weighed in light of fundamental fairness and the circumstances of the case. *B.F. Goodrich Co. v. Tire King of Greensboro, Inc.,* 80 N.C.App. 129, 341 S.E.2d 65 (1986).

■ Essentially, the minimum contacts test requires that the defendant "purposely availed himself" of the "benefits and protections" of the forum's laws. *Kulko v. Superior Court,* 436 U.S. 84, 94, 98 S.Ct. 1690, 1698, 56 L.Ed.2d 132 (1978). The "purposeful availment" requirement has been refined over the years and has been briefed thoroughly by each party.

In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court held that "the 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts ... or of the 'unilateral activity of another party or third person.'" What is sought is conduct by the defendant in relation to the forum state "such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

LCO contends that its involvement with North Carolina was simply a matter of chance. Because there was a six-antigen match, it had no choice but to comply with

---

1. In its oral argument, LCO contended that it erroneously billed the North Carolina entities on this occasion and previously when it supplied organs to the state. However, the invoices do not support a finding of billing error. Rather, they show that by invoicing Southeastern Organ Procurement Foundation directly, payment may be expedited.

UNOS's distribution requirements and had no control whatsoever over where the kidney was to be sent.

Since 1986, however, Defendant has offered over thirty-eight organs to North Carolina residents, ranging from livers and hearts to lungs and kidneys.[2] By its membership in UNOS and participation in UNOS's nationwide electronic database, LCO has directed its activities at North Carolina. Particularly in this instance, LCO created a connection with North Carolina by having its own medical director harvest the kidney, and by allowing another employee to package and ship the kidney to the state. "When the defendant has 'purposefully directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities, then minimum contacts are more likely to be found." *Watson v. Graf Bae Farm, Inc.,* 99 N.C.App. 210, 212, 392 S.E.2d 651, 652 (1990), *quoting Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182.

Jurisdiction may be exercised either generally or specifically. Where jurisdiction is asserted in respect to a claim "arising out of or related to the defendant's contacts with the forum" (specific jurisdiction), the contacts required by due process to support jurisdiction need not rise to the level of "systematic and continuous." However, that level of contacts is required to support an assertion of jurisdiction in respect to a claim that does not arise from or bear relation to the contacts (general jurisdiction). *First American First, Inc. v. National Ass'n of Bank Women,* 802 F.2d 1511, 1516 (4th Cir.1986). *See also Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 nn. 8, 9, 104 S.Ct. 1868, 1872 n. 8, 1873 n. 9, 80 L.Ed.2d 404 (1984).

■ It is the opinion of this Court that LCO has made sufficient contacts with North Carolina to warrant the exercise of specific jurisdiction. Once it is decided that the defendant purposefully established minimum contacts with the forum state, those contacts may be considered with other factors to determine whether imposition of personal jurisdiction would comport with "fair play and substantial justice." *See Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King,* 471 U.S. at 463, 105 S.Ct. at 2177.

LCO has been engaged in sending organs to North Carolina on a regular basis for nearly ten years. Aside from these combined contacts, North Carolina has an interest in securing redress for persons injured within the state. This interest is based on more than the fact that the injured party here is a North Carolina resident, though that fact alone is significant.

LCO's participation in UNOS and compliance with UNOS's policies point one to contacts. LCO has specified that it will "carry on any or all of its operations" and "promote its objectives within the State of Ohio *or elsewhere without restrictions as to place* or amount." (LCO Articles of Incorporation at 3) (emphasis added). LCO knew that the ultimate destination of its work product was North Carolina and that any harm suffered due to its procurement of the kidney would exhibit its effect in North Carolina. The utilization of the kidney in North Carolina was foreseeable in the general sense that any state might receive it before contact by LCO and was foreseeable specifically thereafter.

A single contact by a non-resident defendant may, if sufficiently 'purposeful' in its aim at and sufficiently egregious in its impact upon a forum state's legitimate interests, support a constitutional exercise of specific jurisdiction in respect to a claim arising from that very conduct. *First American First,* 802 F.2d at 1516. The asserted contacts between LCO and North Carolina weigh in favor of supporting jurisdiction when viewed in the aggregate with the number of times organs have been sent to the state and transplanted into North Carolina citizens.

2. LCO claims that since 1990, it has only procured six kidneys that were transplanted or to be transplanted in North Carolina. The specific numbers of organs sent to North Carolina is of no consequence as the Court finds that LCO's activities in sending organs to the state have been methodical.

The Court is aware that the demand for donor organs exceeds the supply and does not overlook the proposition that when organs are supplied for humanitarian reasons, the potential of responding to foreign jurisdiction lawsuits may serve to terminate or reduce that supply to those jurisdictions.[3] That is certainly an important policy concern. But the state has an equally strong, if not stronger interest, in protecting the life and health of its citizens. The nationwide demand for organs can be met while allowing a recipient injured by the negligence of an organ procurer to sue in his home state.

An OPO who expects to defend itself only at the donor site is ignoring the problem that it has caused at the recipient site. At the recipient site, the lack of faith in the system will have the predictable effect of decreasing organ donation. To restore faith, mechanisms for quality control must be in place. Thus, in keeping with due process and public policy, the Court concludes that maintenance of this action against LCO in North Carolina would not offend traditional notions of fair play and substantial justice.

*Conclusion*

In light of the foregoing legal authority, the Court holds that the Defendant's Motion to Dismiss is DENIED. The interests of the state and the relative interests of the parties favor the exercise of jurisdiction by this Court.

---

**3.** Following oral arguments, each party submitted a memorandum in regard to the public policy concerns of this case. The Court, having considered points well-made in each memorandum, is of the opinion that LCO may defend itself in North Carolina without causing a nationwide transplantation crisis.