ANDREA PETERSON v. M.G. "PAT" ROBERTSON, 1999 NCBC 2

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| FORSYTH COUNTY | ) | SUPERIOR COURT DIVISION |
| | | 95 CVS 3518 |
| ANDREA PETERSON, | ) | |
| | ) | **ORDER** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| M.G. "PAT" ROBERTSON, personally | ) | |
| and THE CHRISTIAN BROADCASTING | ) | |
| NETWORK, INC., a Virginia corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

{1} THIS MATTER is before the Court on the Defendant M.G. "Pat" Robertson's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12 (b) (2) of the North Carolina Rules of Civil Procedure. For the reasons set forth below the Court finds that Dr. Robertson is subject to the jurisdiction of the North Carolina courts and, therefore, the motion is denied.

*Alston & Bird, LLP, by Frank G. Smith, III, Michael P. Kenny and Kristine N. McAlister; Puryear & Lingle, P.L.L.C., by David B. Puryear, Jr. and R.J. Lingle, for plaintiff.*

*Maupin, Taylor, Ellis & Adams, by Elizabeth D. Scott; Huff, Poole & Mahoney, P.C., by Glenn A. Huff and David N. Ventker, for defendants.*

## FACTUAL BACKGROUND

{2} Plaintiff, Andrea Peterson, is a citizen and resident of North Carolina. This case arises from the employment of plaintiff's husband, Mark Peterson, as President of American Sales Corporation (hereinafter "American Sales") beginning in 1991. American Sales was, at the time, a wholly owned for-profit subsidiary of Defendant Christian Broadcasting Network (hereinafter "CBN") with a principal place of business in Virginia Beach, Virginia. American Sales is no longer in existence. CBN is a Virginia nonprofit corporation that also has its headquarters and principal place of business in Virginia Beach, Virginia. CBN engages in, among other things, the broadcasting of Christian television programming on a worldwide basis. CBN has conceded that it is subject to the jurisdiction of the North Carolina courts.

{3} Defendant Robertson is Chairman of the Board of Directors and Chief Executive Officer of CBN, and was one of its founders. Dr. Robertson broadcasts a regularly scheduled program, *The 700 Club*, on CBN. At various times, Dr. Robertson was an officer of American Sales, a member of its Board of Directors, and its sole owner. In addition, Dr. Robertson's son, Gordon Robertson, was a director of American Sales. (Robertson Dep. of Feb. 22, 1996, at 207, 208.)

{4} In 1990, CBN, through one of its wholly owned subsidiaries, organized American Sales for the purpose of marketing religious books and supplies, as well as other products. In or about September of 1991, Mark Peterson was hired to work in the American Sales mailroom. In December of 1991, Robertson promoted Peterson from his position in the mailroom to President of American Sales. Peterson had no prior business management experience. One of the central fact issues in this case will be the extent, if any, to which Robertson maintained management control of American Sales during Peterson's tenure as President.

{5} During Peterson's tenure as President of American Sales, the Petersons and Robertson developed a

personal relationship. Robertson provided the Petersons with Christian guidance. Robertson assisted the Petersons in reconciling after a divorce and personally conducted the Petersons' second wedding ceremony in 1992. The Petersons looked up to Robertson as both a religious leader and a personal counselor.

{6} During Mr. Peterson's tenure as President of American Sales its business did not prosper. By March of 1992 the company had losses approaching one million dollars ($924,601.00) and owed a substantial debt to CBN. (Robertson Dep. of Feb. 22, 1996, at 309, 405.) When CBN's Board of Directors decided to divest CBN's ownership interest in American Sales in June of 1992, Robertson purchased 100% of the American Sales stock from CBN, paid off American Sales' debt to CBN out of his personal funds, and assumed the role of sole shareholder and director of American Sales. (Robertson Dep. of Feb. 22, 1996, at 403-406.) Peterson was still President of American Sales at the time. Robertson terminated Mark Peterson's employment with American Sales in December of 1992, one week before Christmas. Andrea Peterson was expecting a child within weeks at the time. Mark Peterson's separation from American Sales was not amicable.

{7} During the early 1990s, Dr. Robertson was campaigning for the office of President of the United States. During his presidential candidacy, the mainstream news media began an investigation of CBN and Dr. Robertson's business interests. Additionally, the United States Internal Revenue Service was conducting an audit of the tax exempt status of CBN and its subsidiaries. The convergence of these inquiries heightened the profile of the problems at American Sales.

{8} The plaintiff alleges that in order to protect the reputation and interests of both Robertson and CBN, Robertson and CBN decided to falsely blame Mark Peterson for all of American Sales' failures. The plaintiff further alleges that in so doing the defendants defamed her husband, accused him of criminal behavior and self-dealing in an effort to deflect responsibility from Dr. Robertson, and then tried to intimidate the Petersons into silence. There is no dispute that the defendants made statements to the media blaming Peterson for American Sales' failures. CBN and Robertson issued such statements to *The Virginian-Pilot*, a Virginia newspaper; and *Newsweek* magazine, among others.[fn1] In addition, the plaintiff alleges that Robertson and CBN engaged in a campaign, which included threats and intimidation, designed to keep the Petersons from talking to the press about Robertson's involvement with American Sales' failed business venture. The plaintiff alleges, for example, that in the spring of 1993, Les Naghiu, Chief of Security of CBN, at Robertson's direction, threatened to harm the Petersons. Specifically, Mr. Naghiu allegedly warned Mark Peterson, "You have a nice family, so take care, because the water is deep and I swim better than you." It is the highly public assault on her husband's integrity combined with the alleged intimidation designed to silence any response from the Petersons which forms the basis of Mrs. Peterson's claim for intentional infliction of emotional distress.

{9} The plaintiff alleges that in the summer of 1994 she decided she could no longer stay in Virginia Beach because of the media attention she was receiving there, Robertson's power and influence in the community, and her fear resulting from the threats the Petersons had received. She moved to North Carolina in early September, 1994.

{10} In the late summer of 1994, reporters from the ABC news program *PrimeTime Live* and representatives from *Newsweek* magazine contacted the Petersons. Upon learning that reporters were trying to find Mark Peterson, Robertson called Pam Johnson, Mr. Peterson's sister and a former CBN employee, on September 16, 1994, to request that she intercede on his behalf to prevent Peterson from talking to the press. When she informed Robertson that the Petersons had already been interviewed, Robertson became angry and, according to Ms. Johnson, told her to deliver a message to her brother: "Pam, you tell your brother that stallions who are out of control get shot. They get taken down. They get shot." (Johnson Dep. at 47-48.) At the time Robertson allegedly made these statements and directed that they be communicated to the Petersons, Andrea Peterson was residing in North Carolina. Johnson told the Petersons about Robertson's statements and also told them that Robertson wished to talk to them about what had transpired. This request prompted Andrea Peterson to call Robertson on September 19, 1994.

This call was made from North Carolina while Mrs. Peterson was a citizen and resident of this State. During the call, Andrea Peterson asked Robertson if he had made the statement that "wild horses get shot." Robertson again criticized Mark Peterson, blamed him for American Sales' failures and admitted that he had made the remark. Andrea Peterson taped that conversation. Dr. Robertson vigorously denies, however, that he intended to threaten the Petersons.

{11} The Petersons allegedly perceived the statements made by Naghiu and Robertson as personal threats. The plaintiff contends that the events described above were part of a campaign designed to intimidate and frighten the Petersons, which lasted until after her arrival in North Carolina and which subjected her to emotional distress.

{12} Mr. and Mrs. Peterson originally brought this suit in the Superior Court of Forsyth County on May 26, 1995. The original complaint asserted causes of action for defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, loss of consortium, and a claim for punitive damages. In July of 1997, Mr. Peterson, who was then estranged from his wife, met with Dr. Robertson. After that meeting, Mr. Peterson took a voluntary dismissal of his claims against the defendants. He stated in open court that his actions were totally voluntary and that he had been neither coerced nor promised any favor in return for his actions. He terminated his counsel; however, they continue to represent Mrs. Peterson. This Court entered an order on July 29, 1997, allowing the voluntary dismissal and directing Plaintiff Andrea Peterson to file an amended complaint. That amended complaint provides the sole basis for plaintiff's current claims for intentional infliction of emotional distress against the defendants.

{13} Shortly after Mark Peterson took his voluntary dismissal, Dr. Robertson made a contribution to the Rock Church in Virginia Beach, Virginia. The money donated to the church was specifically earmarked for Mark Peterson's education in Bible training and ministry at an institution in Texas. (Robertson Dep. of July 21, 1998, at 499, 500.) Some of the funds were sent to North Carolina to pay expenses of Mark Peterson's family.

{14} Dr. Robertson has never lived in nor been a citizen of North Carolina, and has been present in North Carolina on only a few occasions since 1993. (Robertson Aff. at 2.) However, Dr. Robertson spoke at a rally in Charlotte, North Carolina in 1992 to promote the American Sales venture. (Robertson Dep. of Feb. 22, 1996, at 336.)

## ISSUE

{15} The issue before the Court is whether Dr. Robertson is subject to personal jurisdiction in North Carolina based upon the claims asserted in the amended complaint.

## OPINION

{16} In order for North Carolina courts to assert personal jurisdiction over a nonresident defendant, a two-part test must be satisfied. *Dillon v. Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629 (1977). First, there must be a statutory basis for jurisdiction. *Id.* Second, the exercise of jurisdiction must satisfy the constitutional requirements of due process. *Id.* The burden is on the plaintiff to prove the existence of jurisdiction. *De Soto Trail, Inc. v. Covington Diesel, Inc.*, 77 N.C. App. 637, 639, 335 S.E.2d 794, 796 (1985). In so doing, the plaintiff must make out a prima facie case that the acts giving rise to jurisdiction occurred.

## *I. STATUTORY BASIS*

{17} The plaintiff looks to North Carolina long-arm statute, N.C.G.S. § 1-75.4, as the basis for jurisdiction in this case. If there is competent evidence in the record to support a finding that comports with one of the provisions of N.C.G.S. § 1-75.4, jurisdiction will follow under the long-arm statute. *Dataflow Companies v. Hutto*, 114 N.C. App. 209, 212, 441 S.E.2d 580, 582 (1994). For reasons set forth below, this court finds that N.C.G.S. § 1-75.4 is applicable. N.C.G.S. §§ 1-75.4(3) and 1-75.4(4) provide:

A court of this State having jurisdiction over the subject matter has jurisdiction over a person . . . under any of the following circumstances:

> (3) Local Act or Omission. – In any action claiming injury to person or property or for wrongful death within or without this State arising out of an act or omission within this State by the defendant.

> (4) Local Injury; Foreign Act. – In any action for wrongful death occurring within this State or in any action claiming injury to person or property within this State arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury either:

> a. Solicitation or services activities were carried on within this State by or on behalf of the defendant, or

> b. Products, materials or thing processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade.

N.C.G.S. § 1-75.4 (1996). As set forth previously, plaintiff's amended complaint contains allegations that Defendant Robertson made threatening and intimidating statements to her by telephone on September 19, 1994 while she was present and residing in North Carolina, and directed threats to the plaintiff through Pam Johnson on September 16, 1994. Those statements are alleged to be part of an ongoing pattern of intimidation designed to obtain the Petersons' silence. For jurisdictional purposes, the statements made during the telephone calls of September 16 and September 19 constitute acts within North Carolina, and satisfy the requirements of N.C.G.S. § 1-75.4(3). All of the other acts which are alleged to have been committed in furtherance of the goal of obtaining the Petersons' silence and/or inflicting emotional distress took place outside the State of North Carolina and at times that plaintiff resided in Virginia.

{18} The Court is aware of no North Carolina case which addresses the question of whether a threat made over the telephone by one who is outside North Carolina at the time of the call to one who is within North Carolina constitutes an act within this State. Nor is the Court aware of any case addressing the question of whether a threat made through another person to a resident of this State constitutes an act within this State. However, in its decision the Court has considered the North Carolina Legislature's intent in passing the long-arm statute, the judicial construction given to the long-arm statute, and case law from other jurisdictions, all of which support the Court's conclusion that such acts support jurisdiction.

{19} It is well established that the legislative intent in passing the long-arm statute was to grant North Carolina courts the broadest jurisdiction possible, within the limits of due process. *Dillon v. Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629 (1977); *Marion v. Long*, 72 N.C. App. 585, 325 S.E.2d 300, *cert. denied and appeal dismissed*, 313 N.C. 604, 330 S.E.2d 612 (1985); *Regent Lighting Corp. v. Galaxy Elec. Mfg.*, Inc., 933 F. Supp. 507 (M.D.N.C. 1996); *Tart v. Prescott's Pharmacies, Inc.*, 118 N.C. App. 516, 456 S.E.2d 121 (1995). In addition, North Carolina courts have consistently held that the provisions of the long-arm statute are to be liberally construed in favor of finding jurisdiction. *Schofield v. Schofield*, 78 N.C. App 657, 338 S.E.2d 132 (1986). *See also Ciba-Geigy Corp. v. Barnett*, 76 N.C. App. 605, 334 S.E.2d 91 (1985); *Marion*, 72 N.C. App. 585, 325 S.E.2d 300; *Starco, Inc. v. AMG Bonding & Ins. Servs., Inc.*, 124 N.C. App. 332, 477 S.E.2d 211 (1996); *Vishay Intertechnology Inc. v. Delata Int'l Corp.*, 696 F.2d 1062 (4th Cir. 1982).[fn2]

{20} While North Carolina has not addressed the issue before the Court, cases from other jurisdictions provide guidance in the logical construction of the long-arm statute. In *J. E. M. Corporation v. McClellan*, 462 F.Supp. 1246 (U.S.D.C. Kan. 1978), the U.S. District Court in Kansas addressed the situs, for jurisdictional purposes, of a tort arising from an interstate telephone call under circumstances very similar to the instant case. In *McClellan*, the plaintiff contracted with the defendant, McClellan, for the sale of an apartment complex for a total purchase price of $310,000.00. McClellan allegedly agreed to assume a

$200,000.00 note and provide plaintiff with a quantity of jade valued at $110,000.00. The plaintiff alleged that in order to receive an appraisal value for the stones it initiated a single phone call from Kansas to the Defendant Vogel, in Chicago, who was familiar with the jade in question. The plaintiff alleged that Vogel represented over the telephone that the jade was worth as much as McClellan claimed and that its value was increasing. The plaintiff claimed that the jade's true worth was $15,000.00, that Vogel knew that to be the case, and that Vogel intentionally and fraudulently misrepresented the jade's value to mislead the plaintiff and to induce the plaintiff to enter into a contract upon mistaken belief. *Id.*

{21} The Kansas long-arm statute in effect at the time was substantially similar to North Carolina's current long-arm statute. Like our long-arm statute, the Kansas statute enumerated specific grounds for jurisdiction.[fn3] In pertinent part, the Kansas long-arm statute provided:

> (b) Any person . . . who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of said acts:
>
> (2) the commission of a tortious act within this state;
>
> (7) causes injury to persons or property within this state arising out of an act or omission outside this state by the defendant, provided in addition, that at the time of the injury either (i) the defendant was engaged in solicitation or service activities within this state; or (ii) products, materials or things processed, serviced or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of trade or use.

Kan. STAT. ANN. § 60-308. These provisions are the same, in all important respects, as their North Carolina counterparts, N.C.G.S. §§ 1-75.4(3) and 1-75.4(4). In *McClellan*, the plaintiff did not argue that (b)(7), governing acts committed outside the forum, applied to defendant Vogel. The issue before the court was whether Vogel's conduct fell within the meaning of subsection (b)(2). *Id.* The Court held that Vogel's fraudulent, over the phone statements were tortious acts occurring within Kansas, even though the plaintiff initiated the call. *Id.*

{22} The *McClellan* Court rejected the argument advanced by the defendant in that case that if subsection (b)(7) authorizes jurisdiction when injury within the forum results from acts outside, then subsection (b)(2) must be restricted to cases where injury within the forum results from acts within the forum. A contrary interpretation, the argument suggests, would produce an overlap between the two subsections. Subsection (b)(7) would be subsumed within the ambit of (b)(2), since (b)(7) authorizes jurisdiction only upon the satisfaction of one of two different conditions: either the nonresident must have solicited or performed services within the forum, or he must have placed products in the stream of commerce. *Id.* The plaintiff argued that if the *McClellan* court were to read (b)(2) as authorizing service for all cases resulting in injury within the forum, then subsection (b)(2) would permit service on nonresidents contemplated within (b)(7), regardless of whether the latter's two conditions were met. *Id.*

{23} As the *McClellan* Court reasoned, this argument rests upon a misunderstanding of the applicable principles of law. Subsection (b)(7), like North Carolina's 1-75.4(4), was intended to provide jurisdiction over foreign manufacturers or suppliers in products liability cases. A special enumeration for products liability cases in a long-arm statute makes sense, particularly in light of the development of personal jurisdiction law in this country.[fn4] However, the legislature's inclusion of products liability in the long-arm statute should not be read as a limitation on the statute's other provisions. The *McClellan* Court pointed out that a reading of subsection (b)(7) as limiting (b)(2) produces a constriction of the long-arm statute's breadth, a result inconsistent with the intent of the Kansas legislature and courts. Their intent, like their counterparts in North Carolina, was to expand the statute both to assure the inclusion of products liability actions and to assert jurisdiction to the extent permitted by the due process clause. *Id.* at 1250.

{24} Similarly, to read 1-75.4(4) to limit 1-75.4(3) would contradict the clear and consistent intention of the legislature and courts of North Carolina to interpret the long-arm statute liberally and grant North

Carolina courts the broadest jurisdictional power permissible under federal due process. The specific conditions set forth in N.C.G.S. § 1-75.4(4), which logically apply to products liability cases, should not be read to limit North Carolina's jurisdiction in the intentional tort setting. Given the legislative intent of the long-arm statute and the liberal construction given it, it is inconceivable that our law authorizes the assertion of jurisdiction over a nonresident tortfeasor who negligently places a product in the stream of commerce and who, therefore, may only anticipate the possibility of injury in North Carolina, but not over an intentional tortfeasor who causes a direct injury to a North Carolina resident physically present in this state. *See McClellan* at 1252. Thus, the Court concludes that where an out of state defendant commits an intentional tortious act directed at a plaintiff within this state, that act is, for jurisdictional purposes, an act within this state under N.C.G.S. § 1-75.4(3).

{25} Other courts have held that statements made over the telephone by an out of state defendant are deemed to occur in the forum of the plaintiff, and that telephone calls alone can serve as the basis for jurisdiction. In *Schlussel v. Schlussel*, 141 Cal. App. 3d 194, 190 Cal. Rptr. 95, 37 ALR4th 846, (1983), a husband and wife who were residents of California brought an action against the husband's former wife, a New York resident, for intentional infliction of emotional distress arising out of numerous obscene and threatening phone calls allegedly placed by the former wife from Florida. *Id.* The former wife filed a motion to quash service of summons for lack of jurisdiction. *Id.* The California Court of Appeal held that the California courts may assert jurisdiction over a nonresident based on acts done elsewhere when the effect giving rise to a tort is intentionally caused. *Id.* at 195. In support of its position, the court quoted comment (a) to section 37 of the *Restatement (Second) of Conflict of Laws*, which states:

> The act may have been done with the intention of causing effects in the state. If so, the state may exercise the same judicial jurisdiction over the actor, . . . as to causes of action arising from these effects as it could have exercised if these effects had resulted from acts done within its own territory . . . . So one who intentionally shoots a bullet into a state is as subject to the judicial jurisdiction of the state as to causes of action arising from the effects of the shot as if he had actually fired the bullet in the state.

*Id.* at 195. Additionally, California had at the time a criminal statute prohibiting phone calls designed to annoy the recipient. That statute stated in part: "Any offense committed by the use of telephone . . . may be deemed to have been committed either at the place where the telephone call or calls were made or at the place where the telephone call or calls were received." Thus, the *Schlussel* Court appropriately treated the calls as having occurred in California, and authorized the exercise of jurisdiction over the former wife. Following the approach to telephone tort situs taken in *Schlussel*, the threats allegedly received by the plaintiff in the instant case should be deemed to have occurred in North Carolina.

{26} Similarly, in *Norton v. Local Loan*, 251 N.W.2d 520 (1977), the Iowa Supreme Court ruled that a single call made by the defendant creditor to harass the plaintiffs subjected the defendant to jurisdiction under a provision of the Iowa long-arm statute which granted jurisdiction " . . . with respect to any conduct in this state . . . ." *Id.* at 522. The court concluded that the Iowa legislature intended the phrase "conduct within this state" to include a telephone call from another state to Iowa where the call related to the litigation, reasoning that only that interpretation would give a liberal and uniform application to the state's long-arm statute. *Id.*[fn5]

{27} The conclusion that a threat made by phone from out of state to a North Carolina resident provides a basis for asserting jurisdiction in North Carolina is supported by the similar treatment of jurisdictional issues in slander and libel cases. In *Saxon v. Smith*, 125 N.C. App. 163, 479 S.E.2d 788 (1997), the Court of Appeals adopted the view of the U.S. Supreme Court, as stated in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777, 79 L. Ed.2d 790, 799 (1984), that the torts of libel and slander are generally held to occur wherever the offending material is circulated. *Id.* at 170. Thus, even though the defendants in *Saxon* wrote and printed the defamatory material in Virginia, its distribution in North Carolina gave rise to jurisdiction under N.C.G.S. § 1-75.4(3). *Id.* at 171. For jurisdictional purposes, the defendants "acted" within North Carolina.

{28} The comparison is appropriate. Libel and slander are intentional torts whose effects and injuries are naturally aimed at the place of residence of the plaintiff. While a defendant may actually write and send the damaging material in another state, his "act" continues into the forum when the offending material is circulated here. It is the same with a threatening phone call. The threat continues into North Carolina.

{29} In this case the defendants allegedly made libelous and slanderous statements outside this state which they knew or should have known would be published or republished in North Carolina. Those acts were committed at a time the plaintiff was a resident of Virginia and do not, in the Court's view, provide a separate basis for finding jurisdiction over Defendant Robertson. The Court rejects plaintiff's argument that making slanderous or libelous statements that may become part of the information base searchable on the Internet can subject a nonresident to jurisdiction in any forum. Nor does the fact that Dr. Robertson's television program is broadcast worldwide subject him to jurisdiction in any forum.

{30} Federal courts in North Carolina consistently hold that § 1-75.4(1)(d) of the long-arm statute was specifically intended to expand North Carolina's jurisdictional power to the limits of due process, and as a result have merged the two part *Dillon* test into solely a due process analysis. *See, e.g.*, *Regent Lighting Corp. v. Galaxy Elec. Mfg., Inc.*, 933 F. Supp. 507 (M.D.N.C. 1996); *General Latex & Chem. Corp. v. Phoenix Medical Technology, Inc.*, 765 F. Supp. 1246 (W.D.N.C. 1991). While this Court does not believe that the two parts of the *Dillon* test have been merged into a due process analysis by North Carolina's state courts, this view is instructive when considering the proper construction of the state's long-arm provisions. North Carolina federal courts, looking at the long-arm statute and legislative and judicial intent, have concluded that so long as due process is maintained, the long-arm provisions should not be an obstacle to finding jurisdiction. Certainly, it is illogical to demand that the nonresident intentional tortfeasor have the contacts with the state demanded by subsection 1-75.4(4). Those conditions, designed to limit jurisdiction over foreign corporations who commit unintentional torts, have no logical relationship to intentional torts and should not be applied to causes of action arising from them.

{31} In consideration of the above, this Court holds that a nonresident defendant who commits an intentional tort over the phone to a plaintiff in North Carolina is subject to jurisdiction in the North Carolina courts. The plaintiff has made out a prima facie case of intentional infliction of emotional distress against Robertson, specifically arising in part out of threats she alleges he instructed Pam Johnson to transmit to plaintiff's husband and threats plaintiff alleges Robertson repeated to her during the phone call of September 19, 1994. While it is true that the great majority of Robertson's acts in this matter occurred while both he and the plaintiff were in Virginia, the test is not where the majority of the acts occurred. Once the attempt to intimidate the plaintiff crossed the border into North Carolina, Robertson became subject to this Court's jurisdiction. Indeed, as the due process analysis below demonstrates, a single act is enough to confer jurisdiction in many cases. The fact that many of the acts allegedly supporting plaintiff's claim for intentional infliction of emotional distress were committed outside of North Carolina does not shield Robertson from his responsibility to answer in North Carolina for any torts he allegedly committed here.

## II. DUE PROCESS REQUIREMENTS

{32} As stated above, finding a statutory basis for jurisdiction is only the first step in the jurisdictional analysis. The exercise of jurisdiction must also be consistent with the requirements of due process. *Dillon*, 291 N.C. 674, 231 S.E.2d 629. For the reasons set forth below, the Court finds that its exercise of jurisdiction over Defendant Robertson does not violate his right to due process.

{33} Due process of law is offended only when a nonresident lacks sufficient "minimum contacts" with the forum state to make the state's assertion of jurisdiction fair and reasonable. *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L.Ed. 95 (1945). "Minimum contacts" is satisfied when "the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297, 567, 62 L.Ed.2d 490 (1980). The existence of adequate contacts is not determined by the application of mechanical rules but rather by

careful consideration of the particular facts in each case in order to ascertain what is just under the circumstances. *Dillon*, 291 N.C. 674, 231 S.E.2d 629. Some factors commonly considered are: (1) the quantity of the contacts between the defendant and the forum state, (2) the nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) the convenience to the parties. *Brickman v. Codella*, 83 N.C. App. 377, 350 S.E.2d 164 (1986). In addition, a single act that creates a "substantial connection" to the forum can support jurisdiction. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 2 L.Ed.2d 223 (1957).

{34} Federal courts have identified two types of personal jurisdiction: specific and general. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 80 L.Ed.2d 404 (1984). Specific jurisdiction exists when the defendant has purposefully directed his actions at residents of the forum state and the litigation results from injuries that arise out of or relate to those actions. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528 (1985). General jurisdiction exists where a claim does not have any relation to the defendant's contacts with the forum state. *Slaughter v. Life Connection of Ohio*, 907 F.Supp. 929, 933 (M.D.N.C. 1995).

{35} The distinction between specific and general jurisdiction rests upon two obvious points. First, all things being equal, a state has a greater interest in providing a forum for claims based upon conduct causing harm within its borders than for those based on conduct unconnected with the forum's territory. *First Am. First v. National Ass'n of Bank Women*, 802 F.2d 1511, 1516 (4th Cir. 1986). Second, an out-of-state defendant should more reasonably expect to be haled into a foreign state's courts when his purposefully targeted conduct has caused harm within that state's borders. *Id.* Thus, as a general proposition, it is more "fair" to exercise jurisdiction when there is a close relationship among the defendant, the forum, and the litigation. *Id.* The Court finds that specific jurisdiction applies here. Plaintiff has made out a prima facie case that Robertson purposefully directed threats at her while she was a citizen and resident of North Carolina and that her cause of action arises in part from those threats.

{36} The defendant argues that the Court of Appeals has previously ruled that plaintiff has no claim giving rise to specific jurisdiction in this case. The defendant bases this assertion on the dictum in the Court of Appeals' prior decision in this case. Defendant relies on the following passage from the opinion in *Peterson v. Robertson*, *126 N.C. App. 435; 491 S.E.2d 566* (unpublished opinion):

> The present action does not arise out of the defendants contacts with North Carolina. Thus, under *Helicopteros*, defendants can only be haled into the courts of this jurisdiction, if at all, through the exercise of "general" personal jurisdiction.

*Id.* at 3. The Court rejects this argument. The sole issue before the Court of Appeals at the time of its previous ruling was the breadth of plaintiff's discovery requests directed to the members of the Board of Directors of CBN. The Directors had been sued in their capacity as directors of a Virginia nonprofit corporation and not for any intentional act directed to a citizen and resident of North Carolina. The Court correctly observed that the claims asserted against those outside directors in their official capacities would be based on general rather than specific jurisdiction. The claims asserted against Dr. Robertson are of an entirely different nature and arise out of his individual acts, not his acts in the capacity of a director of CBN. At the time of the Court of Appeals' prior ruling, there were no jurisdictional issues before that Court. The opinion dealt with the scope of discovery on the jurisdictional challenge raised by the Directors of CBN. Since the determination of jurisdictional issues was unnecessary to the determination of the issues before the Court of Appeals, the Court of Appeals' statement relating to the lack of specific jurisdiction was dictum. The doctrine of the law of the case does not apply to dicta, but only to points actually presented and necessary to the determination of the case. *Southland Ass'n Realtors v. Miner*, 73 N.C. App. 319, 321, 326 S.E.2d 107, 108 (1985). In addition, the Court of Appeals did not have a full opportunity at the time of its previous ruling to review the facts giving rise to specific jurisdiction in this case.[fn6] Therefore, the Court of Appeals' statement indicating a lack of specific jurisdiction as to the outside directors is not the law of this case.

{37} Having determined specific jurisdiction applies, the question of whether due process is met in this case must be considered in that context. Where specific jurisdiction exists, the central concern of the inquiry is the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the several states. *Shaffer v. Heitner*, 433 U.S. 186, 197, 53 L.Ed.2d 683, 694 (1977). Further, where specific jurisdiction is asserted, the contacts required by due process to support jurisdiction need not rise to the level of the systematic and continuous contacts required to support an assertion of general jurisdiction. *Helicopteros*, 466 U.S. at 414 nn. 8,9. As the Fourth Circuit observed in *First Am. First*, 802 F.2d 1511:

> A single contact by a nonresident defendant may, if sufficiently purposeful in its aim at, and sufficiently egregious in its impact upon, a forum state's legitimate interests, support a constitutional exercise of specific jurisdiction in respect of a claim arising from that very contact.

*Id.* Further, the standard for the exercise of jurisdiction is not a mechanical or quantitative one, *International Shoe*, 326 U.S. 310, 90 L.Ed. 95, but rather is one of "fairness and substantial justice." *Shaffer*, 433 U.S. 186, 53 L.Ed.2d 683. The Supreme Court has said that for the purpose of asserting "specific" jurisdiction, a defendant has "fair warning" that he may be sued in a state for injuries arising from activities that he "purposefully directed" toward that state's residents. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L.Ed.2d 528, 540-541 (1985), cited in *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 348 S.E.2d 782 (1986). When an individual who directs his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Burger King*, 471 U.S. at 478, 85 L.Ed.2d at 544. Robertson's contact with this forum was "purposefully directed" at Andrea Peterson.

{38} As stated above, the quality and nature of the defendant's activities is also important to the due process analysis. Where the conduct is "sufficiently egregious," even a single contact can support jurisdiction. In *First Am. First*, cited above, the Fourth Circuit Court of Appeals deemed the mailing of libelous letters "sufficiently egregious" to support jurisdiction. 802 F.2d 1511. In the instant case, plaintiff's allegations that the phone calls took place are undisputed. If a jury determines that Dr. Robertson's statements were intended to and did intimidate Mrs. Peterson and that his actions were a continuation of a prior pattern of similar conduct, the alleged threats would represent a continuation into North Carolina of egregious conduct. The Court notes here that whether Robertson's statements during the phone calls of September 16 and September 19, 1994 constituted threats and support a claim for intentional infliction of emotional distress are questions for the jury. For jurisdictional purposes, plaintiff has made a prima facie case.

{39} In addition, North Carolina has a great interest in protecting its citizens from intentional torts. As provided in the *Restatement (Second) of Conflict of Laws*:

> A state has a special interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort.

*Restatement (Second) of Conflict of Laws,* § 36 comment (c) (1971). The North Carolina Court of Appeals recognized this interest in the jurisdictional context in *Ciba-Geigy Corp. v. Barnett*, 76 N.C. App. 605, 334 S.E.2d 91 (1985). In *Ciba-Geigy*, the Court affirmed the trial court's assertion of jurisdiction over a nonresident employee of the plaintiff based on the defendant's tortious submission, in this state, of falsified customer complaints and refund requests. *Id.* The Court of Appeals stated: "In light of the powerful public interest of a forum state in protecting its citizens against out-of-state tortfeasors, the court has more readily found assertions of jurisdiction constitutional in tort cases." *Id.* At 608. Thus, North Carolina's strong interest in this case supports the exercise of jurisdiction.

{40} Finally, it is significant that Robertson's contact with this state was not merely fortuitous, but was the result of an intentional affirmative act on his part. As stated above, the alleged intentional nature of Robertson's acts are central to the Court's determination. Robertson is the central figure in this lawsuit, both because of his positions at CBN and American Sales and because of his alleged intentional, personal acts against the Petersons. These factors weigh in favor of a determination that the assertion of jurisdiction is substantially fair.

{41} Robertson argues strongly that personal jurisdiction is improper because he was never physically present in North Carolina. However, the Supreme Court has held that the defendant's physical presence in the forum state is not necessary under due process. *Burger King*, 471 U.S. 462, 85 L.Ed.2d 528. In *Calder v. Jones*, 465 U.S. 783, 79 L.Ed.2d 804 (1984), the Supreme Court made clear that the quantity of a defendant's contacts with the forum is not of paramount consideration. In *Calder*, a professional entertainer brought suit in California over an allegedly defamatory article published in the *National Enquirer*. The suit named an editor for the *Enquirer* as a defendant. The editor, Calder, was a Florida resident who had only been to California twice in his life, once on vacation and once to testify in an unrelated matter.

{42} The Supreme Court focused on the intentional nature of the act, its direction toward the forum, and the fact that the cause of action arose from the act. It held that jurisdiction was proper in California and satisfied due process requirements. Justice Rehnquist, writing for the Court, emphasized the significance of the intentional nature of the defendant's tort, as follows:

> Petitioner(s) liken themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California. Cases which hold that jurisdiction will be proper over the manufacturer . . . should not be applied to the welder who has no control over and derives no benefit from the employer's sales in that distant state.

*Id. The Court went on:*

> Petitioners' analogy does not wash. Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California.

*Id.* Finally, the Court concluded: "In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction is proper over them on that basis." *Id.*

{43} Following *Calder*, jurisdiction over Robertson is proper. Robertson is the primary participant in an alleged wrongdoing intentionally directed at a North Carolina resident. On that basis, the exercise of jurisdiction over Robertson satisfies the requirements of due process.

{44} Robertson asserts that he had no knowledge of Andrea Peterson's whereabouts at the time of the phone call in question and therefore could not have "purposefully directed" his acts toward North Carolina. The critical factor is not whether Dr. Robertson purposefully directed his acts toward North Carolina, but whether he purposefully directed them toward Mrs. Peterson at a time when she was both present and residing in this state. The plaintiff has established a prima facie case of an intentional tort directed at her while in North Carolina. Surely, if Robertson were standing in Virginia and fired a bullet into North Carolina, striking the plaintiff, North Carolina could assert jurisdiction regardless of whether Robertson was aware the plaintiff was across the border. It is equally clear that communicating a threat through another person to a resident of this state is conduct directed toward this state. A defendant who commits an intentional tort purposefully directed at a specific person must fairly expect to be subject to suit <u>wherever</u> that person is at the time of the tortious act.

CONCLUSION

{45} This case presents interesting and close issues because so many of the actions which allegedly give rise to Mrs. Peterson's claim for intentional infliction of emotional distress took place outside North Carolina while she was a resident of Virginia. The fact remains that she moved to North Carolina and, while a citizen and resident of this state, received threats communicated through another person and participated in a phone call in which she alleges that she was threatened and intimidated as part of a long existing pattern of conduct on the part of Dr. Robertson and CBN. The existence of the phone calls and their contents have been established for jurisdictional purposes. Whether those facts support Mrs. Peterson's claim for intentional infliction of emotional distress are a matter for the jury to decide. If the jury concludes that Dr. Robertson's statements were designed to threaten and intimidate Mrs. Peterson and her husband and were part of a continuing effort to silence them (all of which Dr. Robertson and CBN vigorously deny), a tort involving egregious conduct will have been established which supports jurisdiction in this state. There is sufficient evidence in the record at this stage of the proceedings to support such a conclusion even though the issues are hotly contested. If the allegedly egregious conduct did take place, it is clear that jurisdiction would be proper under N.C.G.S. § 1-75.4 and would satisfy the due process requirements of the Constitution of the United States. It simply cannot be said, consistent with the spirit of the prior rulings of the courts of this state, that an alleged intentional tortfeasor who purposefully directs his activities at someone in North Carolina is not subject to this Court's jurisdiction. To so rule would be to impose a greater limit on North Carolina's jurisdictional power than required by due process and subject N.C.G.S. § 1-75.4(3) to a strict construction, contrary to clear legislative and judicial intent.

{46} In consideration of the foregoing, the Defendant Robertson's motion to dismiss for lack of personal jurisdiction is **DENIED**.

This 25th day of May, 1999.

_____

Footnote 1 *The Virginian-Pilot* is located in southeastern Virginia near the Virginia–North Carolina border. The Court finds that Robertson was aware that the statements would likely be circulated in North Carolina. (Robertson Dep. of Feb. 22, 1996 at 39, 40.) However, the Court does not believe this to be a basis for jurisdiction over him. Many slander cases have held that jurisdiction is proper where the harm was foreseeably done to the plaintiff. In this case, Andrea Peterson did not yet reside in North Carolina when the statements to *The Virginian-Pilot* were made. Therefore, when the statements were made, she suffered no real harm in North Carolina, and Robertson could not have foreseen that she would be harmed here.

Footnote 2 The Court notes that the Defendant Robertson has not challenged the application of N.C.G.S. § 1-75.4, but has rested his jurisdictional challenge on the argument that he has had insufficient contacts with North Carolina to satisfy the requirements of due process.

Footnote 3 Some states have enacted "single act" long-arm statutes, which simply grant jurisdiction to the full extent allowed by federal due process without attempting to set forth specific jurisdictional grounds.

Footnote 4 Many of the leading cases governing personal jurisdiction and due process issues arose in the products liability context. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 90 L.Ed. 95, (1945); *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 62 L.Ed.2d 490 (1980).

Footnote 5 The Iowa Supreme Court went on to hold that the call provided sufficient "minimum contacts" with Iowa so the maintenance of the suit did not offend traditional notions of substantial justice and fair play.

Footnote 6 The Court also rejects the contention that plaintiff has made new allegations in her amended

complaint in violation of this court's order. The plaintiff's allegations, taken as a whole, claim intentional infliction of emotional distress as a result of a campaign by the defendants to intimidate and scare the Petersons into silence. The phone call and threats in question are a material part of those allegations.